UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

**PRO SE CIVIL RIGHTS COMPLAINT**
**FOR COMPENSATORY & PUNITIVE RELIEF**

2015 MAY 14 P 12: 30

US DISTRICT COURT
HARTFORD CT

ELOISA GOMEZ TELKAMP,
Plaintiff,

V.

Case No. 3:15cv726(JCH)

VITAS HEALTHCARE CORP. ATLANTIC,
GENESIS HEALTHCARE, LLC,
LAWRENCE & MEMORIAL HOSPITAL INC.,
GROTON AMBULANCE ASSOCIATION INC.,
KIM TROWBRIDGE,
GAIL WARD CURLAND,
TAMARA MARTIN-LINNARD,
ERIN DUNNING,
OFFICER MICHAEL MCCARTHY,
(In his Individual Capacity)
OFFICER CHRISTOPHER BANKS,
(In his Individual Capacity)
CHESTER KANIECKI,
PAULA EDWARDS,
MELISSA MONTE DO,
KRISTY DAVENPORT,
ASHLEY CRESWELL,
DEIDRE CRONIN-VORIH MD,
LAINA BRAASCH,
VITTORIO FERRERO MD,
Defendants.

## I. PRELIMINARY STATEMENT

1. Plaintiff Eloisa Gomez Telkamp is a resident of the state of Texas. She is filing this Lawsuit against the above named entities because her 14th Amendment right to due process of law, her 4th Amendment right against unreasonable searches and seizures and her statutory rights under the Federal Regulations governing Hospice Care throughout the U.S. were violated when she was banished from her daughter, Anna Minshew Gonzalez', deathbed.

2. Plaintiff is also filing this lawsuit because her banishment was a violation of her daughter's rights under the Federal Regulations governing hospice care and led to her daughter's premature death. Which by information and belief, Plaintiff believes is murder.

## II. JURISDICTION AND VENUE

3. Jurisdiction is asserted pursuant to 42 U.S.C Section 1983.

4. Jurisdiction is also asserted pursuant to 28 U.S.C Section 1843(a)(3).

5. Jurisdiction is also asserted pursuant to 28 U.S.C. Section 1367.

6. Venue is proper pursuant to 28 U.S.C. Section 1391(b).

## III. PARTIES

7. Plaintiff, ELOISA GOMEZ TELKAMP, is a citizen of the state of Texas and resides at 5836 Ravendale Lane, Dallas, TX 75206.

8. Defendant, VITAS HEALTHCARE CORPORATION ATLANTIC is a Florida corporation, whose address is 100 Biscayne Blvd., Suite 1500 Miami, FL 33131, and does business in Connecticut as Vitas Innovative Hospice Care, 628 Hebron Ave., Building 2, Suite 300, Glastonbury, CT 06033.

9. Defendant, GENESIS HEALTHCARE, LLC, is a Connecticut corporation whose address is 60 Gillett St., Suite 200, Hartford, CT 06105 and operates the Groton Regency Center, 1145 Poquonnock Road, Groton, CT 06340.

10. Defendant, LAWRENCE & MEMORIAL HOSPITAL, INC. is a Connecticut corporation located at 365 Montauk Ave., New London, CT 06320.

11. Defendant, GROTON AMBULANCE ASSOCIATION, INC. is a Connecticut corporation located at 217 Newtown Rd., Groton, CT 06340.

12. Defendant, KIM TROWBRIDGE, is a citizen of the state of Connecticut and is employed as a Team Leader for Vitas Innovative Hospice Care, 628 Hebron Ave., Building 2, Suite 300, Glastonbury, CT 06033.

13. Defendant, GAIL WARD CURLAND is a citizen of the state of Connecticut and is employed as the Social Services Coordinator at the Groton Regency Center, 1145 Poquonnock Road, Groton, CT 06340.

14. Defendant, TAMARA MARTIN-LINARD, is a citizen of the state of Connecticut and is employed as the Director of Nursing at the Groton Regency Center and resides at 635 Ocean Ave., New London, CT 06320.

15. Defendant, ERIN DUNNING, is a citizen of the state of Connecticut and is employed as a nurse at the Groton Regency Nursing Center and resides at 6 Norman Drive, Gales Ferry, CT 06335.

16. Defendant, MICHAEL MCCARTHY, is a citizen of the state of Connecticut, and is a Police Officer for the Groton Town Police Department, 68 Groton Long Point Rd., Groton, CT 06340.

17. Defendant, CHRISTOPHER BANKS, is a citizen of the state of Connecticut, and is a Police Officer for the Groton Town Police Department, 68 Groton Long Point Rd., Groton, CT 06340.

18. Defendant, CHESTER KANIECKI, is a citizen of the state of Connecticut and was employed by the Groton Ambulance Association Inc. as an EMT and resides at 113 Blueberry Hill Rd. Groton, CT 06340

19. Defendant, PAULA EDWARDS, is a citizen of the state of Connecticut, and is employed by the Groton Ambulance Association Inc. as an EMT and resides at 106 Morse Ave., Groton, Ct 06340

20. Defendant, MELISSA MONTE, DO, NPI #1376793125, Is a citizen of the state of Connecticut and is an Emergency Medicine Physician whose primary practice location is in the emergency department at Lawrence & Memorial Hospital, Inc., 365 Montauk Ave., New London, CT 06320-4700.

21. Defendant, KRISTY DAVENPORT is a citizen of the state of Connecticut and is a Registered Nurse employed in the emergency department at Lawrence & Memorial Hospital Inc., 365 Montauk Ave. New London, CT 06320.

22. Defendant, ASHLEY CRESWELL is a citizen of the state of Connecticut and is employed as a Personal Care Assistant in the emergency department at Lawrence & Memorial Hospital, 365 Montauk Ave., New London, CT 06320.

23. Defendant, DEIDRE CRONIN-VORIH, MD, NPI # 1396943767, is a citizen of the state of Ohio, and is an Emergency Medicine Physician who at all times relevant was in the emergency department at Lawrence & Memorial Hospital Inc., and whose primary practice location is now 4535 Dressler Rd., Northwest, Canton, OH 44718-2545.

24. Defendant, LAINA BRAASCH, NPI # 1528209657, is a citizen of the state of Connecticut, and is a Licensed Clinical Social Worker whose primary practice location is Lawrence & Memorial Crises Intervention Services, 365 Montauk Ave., New London, CT 06320-4700.

**25. Defendant, VITTORIO FERRERO MD, NPI # 1609935840, is a citizen of the state of Connecticut and is a psychiatrist, whose primary practice location is Connecticut Valley Hospital, 1000 Silver St., Middletown, CT 06457.**

## IV. STATEMENT OF FACTS

### *A. Definition of Hospice Care: 42 CFR §418.3*

**26. Before I begin my statement of facts I want it to be perfectly clear that the needs of the family members of a terminally ill patient are covered under the provisions of "hospice care." The Code of Federal Regulations makes the following definition: "*Hospice care* means a comprehensive set of services described in 1861(dd)(1) of the Act…to provide for the physical, psychosocial, spiritual, and emotional needs of a terminally ill patient *and/or family members…* (emphasis mine)."**

### *B. My Daughter was Forced into Hospice Care in Violation of: 42 CFR §418.24*

**27. Choosing hospice care is a decision of great gravity because in choosing hospice care a patient agrees to forgo curative treatment for their terminal illness. The gravity of the decision is why: "Election of hospice care," requires: "(2) The individual's or representative's acknowledgement that he or she has been given a full understanding of the palliative rather than curative nature of hospice care, as it relates to the individual's terminal illness."**

**28. However, my daughter, Anna Minshew Gonzalez, did not 'elect or have a full understanding' of hospice care. On June 14, 2013, the day after I arrived in Connecticut from Texas, to be her primary caregiver, she stated that she wanted out of hospice care. She also stated that she had been forced into hospice care**

by Dr. Kenneth Donovan, an internist at Lawrence & Memorial Hospital, because she had refused, for religious reasons, a blood transfusion. At the time of my arrival she was at the Groton Regency Center, as a Vitas Innovative Hospice Care patient. I have since learned that Dr. John Hennessey, the second doctor to certify my daughter as terminal, is also the Medical Director at the Groton Regency Center, a subsidiary of defendant Genesis Healthcare LLC. Thus, Dr. Hennessey had a vested interest in certifying my daughter as terminal.

*C. My Daughter was Kept in Hospice Care in Violation of: 42 CFR §418.28*

29. The federal regulations clearly provide for "the revocation" of Hospice Care by the patient. Therefore, I told my daughter I would do what I could to get her out of hospice care, but before I could do anything she would have to sign a power of attorney and an advance directive, giving me the power to make medical and financial decisions in her behalf. This she eagerly agreed to do.

30. That very day, we informed defendant Kim Trowbridge, the Vitas Team Leader of her decision. My daughter repeated her decision before a panel of 3 or 4 individuals convened by Trowbridge. The necessary documents were then prepared. However, I was told that a Notary Public was not available until Monday, June 17, 2013. All day Saturday the 15th, my daughter was happy, sociable and alert.

31. On information and belief on Sunday, June 16, 2013, my daughter was overmedicated and was unconscious all day. Trowbridge then called and informed my daughter's ex-husband, Perry Gonzalez, and her estranged daughters, Melina Gonzalez and Angela Rosario, that my daughter was "actively

dying." At her ex-husband and daughters' request my daughter was transferred to a private room.

*D. Violation of My Rights as a Family Member: 42 CFR §418.110*

32. The federal regulations clearly state: "The hospice must provide…Accommodations for family members to remain with the patient throughout the night." Therefore, when I was informed that my daughter was actively dying I settled in to keep a "vigil" or "death watch." On average the active phase of dying lasts 3 days. Therefore, I requested a cot be set up in her room so I could get some sleep. However, defendant Gail Ward Curland, the Groton Regency Social Services Coordinator, refused. It was her allegation that 'only a hospice that cares for patients in its own facility must provide overnight accommodations for family members,' which I have since learned is not true according to the federal regulations.

33. Therefore I, a 73 yr. old (at the time), woman tried to sleep as best I could on a straight backed chair with my head on a dining table. However, Curland twice accused me of sleeping in an empty bed in another room and threatened to call the police for "trespass." I had not slept in an empty bed and vehemently denied the allegations.

*E. Banished to Prevent Me from Employing a Notary Public*

34. By Wednesday, June 19, 2013, my daughter was once again awake and alert. My daughter was doing too well for me to believe she was "actively dying." Therefore, I once again requested a Notary Public so that my daughter could sign an advance directive and power of attorney. Trowbridge's response was that it

was my responsibility to find a Notary Public. I then asked her why I was led to believe one would be available on Monday. Her reply was: "You didn't really expect Vitas to provide legal services for you, did you?"

35. Trowbridge then continued and stated that in any event arrangements for her care had already been made by her immediate family. I reminded her that my daughter had stated before a panel of 3 or 4 individuals that she wanted me to get her out of hospice and to make arrangements for her care. Trowbridge repeated that it was up to me to find a Notary. On information and belief, I believe I was banished because that very day I located a Notary Public. However, she could not come until Friday, June 21, 2013.

*F. Violation of My Rights by Groton Regency Center: 42 CFR §418.112*

36. The following day, Thursday, June 20, 2013, at around 10:00 pm, defendant Tamara Martin-Linnard, the Groton Regency Director of Nursing, and defendant Erin Dunning, one of the nurses, repeated Curland's allegation that "only a hospice that cares for patients in its own facility must provide overnight accommodations for family members." They also alleged that I was and had been "trespassing" by keeping an overnight "vigil" in my dying daughter's private room and called the police.

37. This allegation was absolutely not true. A hospice has the duty to provide overnight accommodations even if it is not its own facility. The regulation states: "*Standard: Written agreement.* The hospice and SNF/NF or ICF/IID must have a written agreement that specifies the provision of hospice services in the facility. The agreement must be signed by authorized representatives of the

hospice and the SNF/NF or ICF/IID before the provision of hospice services." The Groton Regency was providing "hospice services" for my daughter. Thus, they should have had a written agreement that obligated them to provide "overnight accommodations" for me. Particularly, if she was "actively dying" as they claimed.

*G. The Issuance of a Ticket for "Public Disturbance" was a Subterfuge*

38. The federal regulations cited above gave me the right to spend the night with my dying daughter. Therefore, the issuance of a ticket for "creating a public disturbance," was a subterfuge to avoid taking me to a court of competent jurisdiction after my arrest and allege "probable cause" on the issue of "trespass" as follows: When defendants, Officers Michael McCarthy and Christopher Banks of the Groton Town Police Department arrived, Martin-Linnard and Dunning alleged that I was "trespassing" and that on two previous occasions, not reported to the police, I had been caught sleeping in one of the empty beds in the ward. I denied these false allegations.

39. The Officers then forcibly removed me from my daughter's room and took me to the lobby of the Groton Regency and started interrogating me. At that point I was under the impression that I was under arrest for "trespass" and that I was going to go to jail for "trespass." Therefore, I asserted my "Miranda Rights."

40. However, the Officers kept insisting that I was not under arrest. When it became clear that I was not going to answer any questions, I was issued a ticket for "creating a public disturbance," not "trespass." Therefore, at that point I

believed that the incident was over and that I was free to return to my daughter's room.

41. However, I was not allowed to go back to my daughter's room. Instead, I was physically escorted by the police to a waiting ambulance. Since I had been told that I was not under arrest I refused to board the ambulance. Officer McCarthy then alleged that he could smell liquor on my breath and that I was clearly intoxicated. He then told me that he was taking me under "protective custody," to the hospital to "sober up." I vehemently denied being intoxicated or having had anything to drink. When I continued to refuse to board the ambulance I was forcibly shoved in and injured.

42. In January of 2014, I received a copy of the Police Report. The Police Report makes absolutely no mention of "protective custody." Instead it states: "Telkamp was transported by Groton Ambulance to the hospital due to her intoxication level." The Police Report also states that: "Telkamp admitted that she consumed some vodka this evening." Because I was standing on my "Miranda Rights," there is no way I would have admitted to drinking anything – even a soft drink. The Police Report also states: "There was an empty vodka bottle in her handbag." However, an empty vodka bottle could not have been found in my handbag because during the entire interrogation my handbag was on my person and was not searched.

43. When I received the Police Report in January of 2014, I learned for the first time that I had been "banished" by Martin-Linnard. The Report states: "Dunning said that Telkamp needed to leave the Groton Regency due to her

behavior. Tamara Martin-Linnard, who is the director of nursing at the Groton Regency, responded and advised Telkamp that she was banned from the Groton Regency due to her actions and previous incidents not reported to the police."

44. When the Officers issued me the infraction ticket, as I have already stated, I thought the incident was over. However, it was not over. The Police Report continues: "Telkamp was transported by Groton Ambulance to the hospital due to her intoxication level. I issued Telkamp an infraction for Creating a Public Disturbance. I also issued Telkamp a trespass warning. Telkamp was advised that she would be arrested if she returns to the Groton Regency."

45. It was only after my arrival at L&M Hospital that I learned of the criminal charges made against me by Martin-Linnard and Dunning and of the threat to arrest me for trespass if I returned to the Groton Regency. The Police Report clearly states: "PUBLIC DISTURBANCE: NO FIGHT/NO THREAT//NO OBSTRUC (sic)." However, the Emergency Department Chart states: "PATIENT ARRIVES INTOXICATED AFTER HIDING OUT AT NURSING HOME IN DAUGHTERS ROOM, THEN ASSAULTING STAFF. (KRDA 06/21/2013 00:16)"

46. When he was interrogating me Officer McCarthy kept insisting that I was not under arrest. However, that I was under arrest is clear from the Police Report itself because it states: "Incident Closed By Arrest." Therefore, by law, the Officers had only one option: Take me before a court of competent jurisdiction! However, an "infraction" requires only the payment of a fine. Thus, the issuance of a ticket for an "infraction" was a subterfuge to avoid taking me before a "court

of competent jurisdiction" and allege "probable cause" on the charges of "trespass" and "assault." I have attached the Police Report hereto as Exhibit A.

*H. There was No Legal Basis for My Involuntary Transport to the Hospital*

47. The lack of a legal basis for my transport began, first of all, with the dispatcher. In the ambulance bill the dispatcher lists as "Reason(s) For Transport: 303.00." However, "303.00" is not an Emergency Code. The full reading of the code states: "303.00 Acute Alcoholic Intoxication in Alcoholism Unspecified Drinking Behavior." An ambulance cannot be dispatched under that code because it is a diagnostic code under the International Classification of Diseases (ICD) code. And in this context the use of the words: "Acute Alcoholic Intoxication" has nothing to do with the "*medical emergency" of "acute alcoholic intoxication."* Thus, clearly the code was used to imply that I was suffering from "acute alcoholic intoxication" and in need of "emergency treatment." I have attached a copy of the ambulance bill as Exhibit B and the Codes as Exhibit C.

48. Second, Officers McCarthy and Banks did not provide the ambulance crew with an Emergency Involuntary Committal form. They could not provide one because there was no emergency of "acute alcoholic intoxication." The ambulance report states: "UOA fd a 73 year old female patient in custody of the town PD." And under "Level of Consciousness" they state: "Alert." And under "Chemically Paralyzed" they state: "No." So clearly there was no emergency for "acute alcoholic intoxication."

49. Third, because there was no Emergency Involuntary Committal form, I was free to identify myself to the ambulance's EMT's, Chester Kaniecki and Paula

Edwards by my maiden name of Gomez. And under the name of Gomez, I clearly stated that I did not consent to my transport to the hospital. The ambulance report clearly shows that "Gomez" was "Alert" and "refused to sign."

50. Fourth, without my signature, Kaniecki and Edwards were required to fill out and sign an "Ambulance Crew/Facility Rep Signature" form, which they failed to do. An unsigned form is included with the ambulance report. It is clear from the instructions why the form was not filled out and signed. The instructions state: "Complete this section ONLY if All of the following are true: 1. The call is an emergency transport. 2. The patient was physically or mentally incapable of signing. AND 3. No authorized representative was available or willing to sign on behalf of patient at time of service." None of those applied. Therefore, they could not and did not fill out and sign the form. I have attached the Ambulance Report hereto as Exhibit D.

51. Because I gave my maiden name and refused to sign, defendant Groton Ambulance Association has been unable to bill Medicare for my transport. They state: "On the day that you were transported, the ambulance crew was unable to obtain a signature from you which is currently preventing us from billing your insurance carrier directly for this claim." (See Exhibit B)

***I. There was No Legal Basis for Detaining Me Against My Will at L&M Hospital***

52. There was no legal basis for my detainment by L&M, because once in the ED, I lost no time in letting the staff know that I did not consent to my confinement. Second, I was fully capable of making that decision. Defendant Dr. Melissa Monte states in the Emergency Department Report that: "She is awake

and alert, and as stated above has a steady gait." Third, the Ambulance Crew/Facility Rep Signature form submitted to the hospital was not filled out and signed by the ambulance crew. Thus, the receiving facility is not named. And upon arrival defendant "Ashley Creswell," who is a PCA and not an "Authorized hospital representative," signed the form for the unidentified facility. And finally the patient Eloisa Gomez was awake and alert and refused to sign any admittance paperwork either as Eloisa Gomez or Eloisa Gomez Telkamp. (See Exhibit D)

## *J. Abused and Demeaned by RN at Triage and by PCA*

53. At triage, defendant Kristy Davenport, RN, accused me of: "AGGRESSIVE BEHAVIOR/ETOH." However, she did not perform a Blood Alcohol Concentration (BAC) test to confirm that alcohol (ETOH) was responsible for my aggressive behavior. Such a test is required under Connecticut's "protective custody statute." (CGS 17a-683) On information and belief, I believe she did not perform a BAC test because she knew that I was not intoxicated. In the Emergency Department Chart, she states: "MENTAL STATUS Alert. Oriented X3 (Person, Place, Day)." Thus Davenport's accusation had no basis in fact.

54. Davenport also alleged 4 reasons why I was considered a "Suicide Risk" and concluded: "The patient has been placed under suicide precautions." Davenport also alleged that I: "ASSAULTED STAFF AT NURSING HOME." She then informed me that I was clearly "an assault risk" and "an elopement risk." She then posted a security guard over me and warned me that if I tried to leave the emergency room I would be tied to the bed. This threat constituted assault.

**55. Likewise, defendant Ashley Creswell, the ED PCA alleged that I had gotten drunk and was "pushing and hitting the staff at the Groton Regency." She also informed me that if I returned to the Groton Regency I would be arrested. Creswell also threatened that I would be tied down to the bed if I tried to "escape." Likewise, this threat constituted assault**

***K. There was No Legal Basis for My Chemical Restraint***

**56. In an online article titled "*Chemical Restraint*" by author Benjamin B. Mattingly, MD, an overview of the threats that physicians and healthcare workers face in Emergency Departments every day is given. He concludes his overview by stating: "Ultimately, a patient who poses a threat to himself or others requires some form of restraint. Physical and chemical restraints can be used as a last resort to help control a violent situation." However, in my case, there is no record identifying a victim of violent behavior on my part. The closest anyone came to alleging aggression on my part was Kaniecki, the ambulance crew member, who stated: "Patient is mildly belligerent and is refusing to answer any questions."**

**57. Dr. Mattingly continues and states: "The 3 main classes of medications used to chemically restrain a patient are benzodiazepines, typical or classic antipsychotics, and atypical antipsychotics." Those were the type of drugs I was forced to take at around 2:00am, on June 21, 2013. However, the incident as reported in the ED Chart does not describe a violent situation. It states: "NOTIFIED MD REGARDING PATIENT WITH INCREASING ANXIETY-REQUESTING TO TALK TO HUSBAND AFTER CALLING HIM 2X. THEN CRYING, THEN ANXIOUS TO CALL NURSING HOME, PACING ETC. (KRDA 01:48) PATIENT BECAME OUT**

OF CONTROL, SCREAMING AND YELLING, CRYING AND INCONSOLABLE. REQUIRED TO BE MEDICATED WITH ORAL ATIVAN IMG AND BENADRYL 25MG PO, AND IMM HALDOL5MG AND IM ATIVAN IMG (KRDA 02:09)." Nothing in the above account depicts a violent patient who required restraint. Instead it depicts a grieving mother who wanted to return to her dying daughter's bedside, as was her constitutional and statutory right.

58. Dr. Mattingly continues under "Legal Considerations" and states: "Any time the decision is made to restrain a patient, either physically or chemically, legal considerations must be taken into account....although being in the ED does legally imply consent to treatment, a patient does have the right to refuse a treatment course, unless the patient is deemed incompetent or a threat to himself or others." In my case being in the ED did not imply consent because I was fully competent and did not consent to my admittance to the ED!

59. Dr. Mattingly concludes: "If a patient imposes no threat to himself or others and has the capacity to make reasonable decisions, then he cannot be confined or restrained without his permission. If held against his will, a patient has the right to charge the health professional with false imprisonment or battery."

*L. There was No Legal Basis for a Crisis Intervention*

60. The next day, Friday, June 21, 2013, while still under the influence of the drugs I had been forced to take the previous night, Defendant Dr. Deidre Cronin-Vorih referred me to defendant Laina Braasch of L&M Hospital's Crisis Intervention Services for an Emergency/Psychosocial Assessment.

61. However, there was no legal basis for a crisis intervention because I was not in crisis. Therefore, the Officers could not and did not file a Police Emergency Examination Request (P.E.E.R.) form, citing: "reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and in need of immediate care and treatment." (CGS § 17a-503) In fact the Police Report indicates I was not in crisis and dangerous to myself or others. It states: "PUBLIC DISTURBANCE: NO FIGHT/NO THREAT//NO OBSTRUC (sic)." (See Exhibit A)

*M. The Crisis Intervention Consisted of Accusations of Criminal Behavior*

62. Braasch's so called Emergency/Psychosocial Assessment consisted of accusations of criminal behavior. She states: "Pt…became argumentative and assaultive w/staff….got into an argument w/her daughter's boyfriend. She was also intoxicated, and per nursing report had a bottle of vodka on her & was sharing it w/ her daughter." I of course denied her accusations. However, she states: "Pt. denies recollection of what happened." I did not deny recollection of what happened, I denied that they happened at all! The criminal allegations of assault belonged before a court of competent jurisdiction, not Braasch!

*N. The Crisis Intervention was an Illegal Means to Enforce My Banishment*

63. That the purpose of the crisis intervention was to enforce my banishment is clear from the report of defendant Dr. Vittorio Ferrero, the consulting psychiatrist. He recounted the same allegations of intoxication and assault that Braasch made, and I once again denied the allegations. However, he states: "She had a blackout about what happened the past two days." I did not

have a "blackout," the allegations of assault and intoxication simple did not happen! If true, the allegations of assault should have been before a court of competent jurisdiction not Dr. Ferrero.

64. That the purpose of the consultation was to enforce my banishment is clear from the conclusion to his report. He states: "Pt was intoxicated….If she were to return to Groton Regency she would be arrested….And disposition-return home to Texas." This was a gross violation of the law because even under the authority of a P.E.E.R. form, the only authority Dr. Ferrero had under CGS § 17a-503 was to send me to treatment. The statute states: "The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502." Therefore, if I did not need treatment, I should have been free to return to my daughter's room as was my constitutional and statutory right. Thus, Dr. Ferrero's actions enforced my banishment without due process of law and forced me to return on June 22, 2013, home to Texas without saying goodbye to my daughter. I never saw my daughter again!!!

## *O. My Daughter was Murdered*

65. On information and belief, my daughter was a valuable commodity that Vitas and the Groton Regency did not want to lose. Therefore, I was banished to prevent me from taking my daughter out of hospice care. This was true to Vitas' pattern. In a federal lawsuit filed in May, 2013, Vitas is accused of harming patients in the pursuit of profits. The suit, based on allegations brought by former Vitas employees in Texas, California and Illinois, contends Vitas "focused on

maximizing Medicare reimbursement for as many patients as possible while disregarding patients' medical needs."

66. On information and belief, depriving my daughter of her "emotional support," and the opportunity to seek "curative treatment," is tantamount to murder.

## V. CAUSES OF ACTION

### *Count 1: Deprived of Liberty Without Due Process of Law*

67. I was deprived of my right to keep a "vigil" or "death watch," in my daughter's private room. Keeping a vigil or death watch is a liberty right. A "liberty right" is protected by the "due process clause" of the 14th Amendment. My right to keep a vigil was also protected by the federal regulations governing hospice care throughout the U.S.

68. I was deprived of my right to keep a "vigil" by Tamara Martin-Linnard, the Director of Nursing at the Groton Regency who banished me from the Groton Regency. This was a gross violation of my rights because banishment is a form of punishment that can only be imposed by legal authority after a trial. Usually banishment is imposed by a country or state after a trial. The U.S. Constitution does not prohibit banishment, as long as the punishment and sentencing meet the substantive and procedural requirements of "Due Process of Law."

69. At Martin-Linnard's behest, Officers Michael McCarthy and Christopher Banks forcibly removed me from my daughter's private room. And without taking me to a court of competent jurisdiction, they threatened to arrest me for "trespass" if I returned to the Groton Regency. However, I did not learn of my

banishment by Martin-Linnard until I read the Police Report six months later. Thus, I was deprived of liberty without due process of law.

***Count 2: Breach of Contract***

70. It is clear from the plain language of the hospice regulations that family members are a party to the hospice care contract. The contract was grossly violated when Martin-Linnard banished me and had me forcibly removed from my dying daughter's room. In December of 2013, I spoke to Kim Trowbridge the Vitas Team Leader about what happened. Her excuse for doing nothing was that because it was not Vitas' own facility, she was powerless to do anything. This is absolutely not true and *42 CFR §418.112,* makes this abundantly clear.

71. The breach of the contract with me breached the contract with my daughter and ruined her "quality of life." 42 CFR §418.3, states: "*Palliative care* means patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering. Palliative care throughout the continuum of illness involves addressing physical, intellectual, emotional, social, and spiritual needs...." My daughter died 20 days after my banishment without a single family member present.

72. On information and belief, the defendants' actions amounted to murder because murder is defined: "Murder is the unlawful killing of a human being with malice aforethought." (*Title 18, U.S.C. § 1111-Murder*) The *U.S. Courts for the 9th Circuit's Manual of Model Criminal Jury Instructions* states: "To kill with 'malice aforethought' means to kill either deliberately and intentionally or recklessly with extreme disregard for human life." By denying my daughter her emotional

support and her right to seek "curative treatment," the entities involved showed "extreme disregard for human life." Thus, they committed murder with "malice aforethought."

*Counts 3-4: False Arrest & Imprisonment in Violation of My 4th Amendment Rights*

73. Officers McCarthy and Banks' actions were a false arrest and imprisonment because, per the federal regulations governing hospice care, I was lawfully in residence in my daughter's private room. The Officers did not search my handbag. However, they claimed that they did and found "an empty vodka bottle." Therefore, the claimed search of my handbag and my forcible removal from my daughter's room was a violation of my 4th Amendment rights against "unreasonable searches and seizures."

*Count 5: False Imprisonment by the Ambulance Crew*

74. My transport to the hospital by Paula Edwards and Chester Kaniecki was a false imprisonment because: (a) Officers McCarthy and Banks did not provide an "Emergency Involuntary Committal" form; (b) I was alert and clearly stated that I did not consent to the transport; and (c) I refused to sign anything.

*Count 6: False Imprisonment by L&M Hospital*

75. My detainment by L&M was a false imprisonment because: (a) Officers McCarthy and Banks did not file an "Emergency Involuntary Committal" form; nor (b) did the Officers file a "Police Emergency Examination Request (P.E.E.R.) form" alleging that they had "reasonable cause" to believe that I had "psychiatric disabilities" and was a danger to myself or "others;" nor (c) did the ambulance crew provide the hospital with a filled out and signed "Ambulance Crew/Facility

Rep Signature form" certifying that I was physically or mentally incapable of signing; and (d) most important of all, I was "Awake and alert" according to Dr. Monte, and did not agree to the detainment.

***Counts 7-8: Slander Per Se by Officers McCarthy and Banks***

76. On June 20, 2013, Officers McCarthy & Banks issued me a ticket for creating a public disturbance, which is a misdemeanor. The Police Report clearly states: "PUBLIC DISTURBANCE: NO FIGHT/NO THREAT//NO OBSTRUC (sic)." (See EXHIBIT A) However, at L&M Hospital, I learned that the Officers, in contradiction, had verbally alleged to the L&M staff that I had 'assaulted the staff of the Groton Regency.' Assault of a health care provider is a class C felony punishable by one to ten years imprisonment. (C.G.S. Sec. 53a-167c) Thus, the Officers allegations of criminal activity were slanderous per se.

***Counts 9-10: Slander Per Se by Tamara Martin-Linnard and Erin Dunning***

77. Martin-Linnard and Dunning of the Groton Regency alleged to the emergency room staff of L&M Hospital that: 'I had gotten intoxicated, fought with my daughter's boyfriend, had a bottle of vodka on me and assaulted the staff of the Groton Regency who caught me giving some vodka to my terminally ill daughter.' Their allegations of intoxication and criminal behavior were slanderous per se. Martin-Linnard and Dunning did not identify the staff members who allegedly caught me giving vodka to my daughter and whom I allegedly assaulted.

***Counts 11-13: False Imprisonment, Libel Per Se & Assault by Kristy Davenport***

78. At triage Davenport alleged that I: "ASSAULTED STAFF AT NURSING HOME." This allegation was a repeat of the slanderous allegations made by

Officers McCarthy and Banks, Martin-Linnard and Dunning. And are libelous per se and should have been brought before a court of competent jurisdiction. Based on those allegations Davenport concluded that: "Patient is an assault risk." She also concluded that: "Patient is an elopement risk." She then proceeded to post a security guard near my bed and threatened that if I tried to leave I would be tied to the bed. The posting of a security guard without authority of law constituted false imprisonment and her threat to tie me down to the bed constituted assault.

*<u>Counts 14-16: False Imprisonment, Libel Per Se & Assault by Ashley Creswell</u>*

79. Creswell without authority of law signed the unfilled out Ambulance Crew/Facility Rep form admitting me to the ED, which action constituted false imprisonment. Creswell also repeated the allegations made by Officers McCarthy and Banks, Martin-Linnard and Dunning and accused me of "hitting and pushing" the staff at the Groton Regency. Her allegations are libelous per se and should have been brought before a court of competent jurisdiction. She too warned me that if I tried to "escape" I would be tied to the bed. Her threat constituted assault.

*<u>Counts 17-18: False Imprisonment, Assault & Battery by Dr. Melissa Monte</u>*

80. I made it clear to Dr. Monte that I wanted to leave. Her ED Report states: "The patient is very agitated...She is requesting to leave the emergency department....The patient was kept in the emergency department until she could be evaluated by crisis in the morning."

81. At around 2:00am, I became hysterical over not being allowed to return to my dying daughter's bedside. I was then forced to take a cocktail of drugs that I have since learned are used in emergency departments, psychiatric wards and

jails as a chemical restraint on violent patients or inmates. However, I was not violent. I was a mother who desperately wanted to return to her terminally ill daughter's bedside. The chemical restraint constituted both a false imprisonment and assault & battery.

*Counts 19-20: False Imprisonment & Libel Per Se by Dr. Deidre Cronin-Vorih*

82. In the ED Chart Dr. Cronin-Vorih states: "Primary Diagnosis: Acute Alcoholic Intoxication in Alcoholism." However, this diagnosis is not an emergency and cannot be made or treated in an emergency room setting. Thus, my treatment in the emergency department was a false imprisonment. The diagnosis is libelous per se.

*Counts 21-23: False Imprisonment, Libel Per Se & Assault by Laina Braasch*

83. Without my consent or the authority of a P.E.E.R. form, Braasch's, so called "psychiatric assessment," was a false imprisonment. It was libelous per se because she repeated the criminal allegations that should have been before a court of competent jurisdiction. And alleged that: "Pt denies recollection of what happened" when in fact I clearly stated that "it did not happen." It was an assault because she threatened that if I returned to the Groton Regency, I would be arrested.

*Count 24-26: False Imprisonment, Libel Per Se & Deprivation of Liberty Without Due Process of Law by Dr. Vittorio Ferrero*

84. Without my consent or the authority of a P.E.E.R. form Dr. Ferrero's consultation was a false imprisonment. It was also libelous per se because he repeated the slanderous allegations of criminal behavior made by McCarthy, Banks, Martin-Linnard and Dunning. It was also a deprivation of liberty without

due process of law, because he affirmed, without authority of law, my banishment by concluding his report with the words: "And disposition-return home to Texas." I never saw my daughter again!!!

*Counts 27-28: Personal Injury by Gail Ward Curland and Kim Trowbridge*

85. There are three elements in a personal injury case:

Element 1: The presence of a duty owed by one person to another. Per federal regulations a hospice has the duty to provide overnight accommodations for family members.

Element 2: Someone breached their duty. Gail Ward Curland, the Social Services Coordinator at the Groton Regency, breached that duty when she alleged that "only when it's the hospice's own facility must a cot be provided." Kim Trowbridge, the Vitas Team Leader, also breached that duty when she didn't intervene and demand that Ward comply with the hospice regulations.

Element 3: The breach directly causes injuries. The breach directly caused me injury. The breach caused severe sleep deprivation, which deprivation is known to cause health problems and in my case it damaged my heart.

86. When I returned home on June 23, 2013, I could not get out of bed for 8 days. I felt a strange lethargy I had never felt before. Finally, on July 1, 2013, I had to be rushed to the hospital with symptoms of a heart attack. I was admitted for tests. The tests indicated that there were problems with my heart that needed to be watched. This outcome is consistent with what the Huff Post of October 20, 2013, in the Healthy Living section stated: "After just seven nights of too little sleep, researchers observed more than 700 genetic changes that could play a role

in consequences including ***heart problems*** and obesity." Due to Curland's breach of duty, I, at the time, a 73 old woman, was severely sleep deprived for ten days, not seven, and for the first time in my life, had a medical issue with my heart. I believe that the drugs forced on me and the sleep deprivation I suffered, because of the lack of sleeping accommodations, damaged my heart.

***Counts 29-43: Intentional Infliction of Emotional Distress by All Individual Defendants***

**87. The Connecticut Civil Jury Instructions state: "The defendant's liability for intentional infliction of emotional distress requires that you find that (his/her) conduct exceeded all bounds usually tolerated by decent society. Liability can be found only where the defendant's conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse (his/her) resentment against the actor, and lead (him/her) to exclaim, Outrageous!"**

**88. Accusing a mother of criminal behavior and banishing her from her dying daughter's bedside without "due process of law," is conduct that goes "beyond all possible bounds of decency," is "atrocious" and "utterly intolerable in a civilized community," and clearly "outrageous!"**

**89. I cannot begin to describe the severity of my emotional distress when I learned that my daughter kept asking after my departure: "Where's my mama?" "What happened to my mama?" Nor, can I describe my emotional distress when**

she died alone without me there to comfort her 20 days after my departure to Texas.

90. I will eventually come to terms with my daughter's death. I will never come to terms with the fact that she died without me at her bedside to comfort her. Nor, will I ever be convinced that she was not murdered.

## VI. REQUEST FOR RELIEF

Wherefore, I respectfully request the Court to enter judgment in my favor and against the defendants and award me the following relief.

1. Compensatory damages as proven at trial;
2. Punitive damages as proven at trial;
3. Costs of suit, and if I should hire an attorney, an award of reasonable attorney's fees; and
4. Such other and further relief as the court shall deem proper

## VII. JURY DEMAND

Plaintiff Eloisa Gomez Telkamp demands a jury trial.

Respectfully submitted,

Eloisa Gomez Telkamp

Eloisa Gomez Telkamp
5836 Ravendale Lane
Dallas, Texas 75206
Home Phone: 214-584-6595
Cell Phone: 214-205-2835
gtstonewall@sbcglobal.net